## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CYNTHIA GUNN,             :
                                :
             **Plaintiff,**       :
                                :    **CIVIL ACTION**
      v.                        :
                                :
                                :    **NO. 16-1271**
ON THE BORDER ACQUISITIONS,    :
LLC,                                 :
             **Defendant.**

## M E M O R A N D U M

**STENGEL, C.J.**                                            **March 28, 2018**

        This case involves a claim of sexual harassment, sex-based discrimination, and retaliatory practices. Plaintiff, Cynthia Gunn, was employed as a server by defendant, On the Border Mexican Grill and Cantina ("OTB"). Plaintiff alleges she was sexually harassed by defendant, William Walker, who was also employed by OTB. Plaintiff asserts four claims against OTB: (1) hostile work environment stemming from sexual harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) retaliation under Title VII; (3) negligence under Title VII[1]; and (4) negligent retention under state law.

---

[1] Because Title VII does not recognize a separate cause of action based on negligence, I will consider this claim as an additional argument for OTB's liability for subjecting plaintiff to a hostile work environment. See Marcial-Delima v. Eastern Doughnuts, 16-2631, 2017 WL 1092337, at *5 (E.D.Pa. Mar. 23, 2017).

OTB moves for summary judgment as to all four claims. (Doc. No. 34.) Plaintiff opposed OTB's motion. (Doc. No. 37.) For the reasons discussed below, OTB's motion for summary judgment is granted in full.

## I. Background

Plaintiff began working at OTB as a server in September of 2009 at the Airport Road restaurant in Allentown, Pennsylvania. (JA 0032.) Defendant, Walker was a cook for OTB. (JA 0444.) At the time of the incident, Walker was out of work on medical leave as a result of a serious health condition. (JA 0494.)

<u>OTB's Policies and procedures</u>

OTB's Employee Handbook identifies its policies and procedures regarding all forms of discrimination and harassment. (JA 0319-21.) OTB's policy prohibits sexual harassment and "applies to everyone involved in [its] operations (including guests) and prohibits harassment by any Team Member of the Company." (JA 0319-20.) OTB's policy expressly prohibits "[r]etaliation against any person who voices a concern, files a complaint with Human Resources or participates in any subsequent related investigation . . . ." (JA 0320.)

OTB Team Members who are subjected to any form of harassment or discrimination, or who have witnessed harassment or discrimination, are obligated to report it immediately to any of the following: supervisors, managers, Area Directors, or Human Resources. (JA 0320.) OTB Team Members are free to pick from among those listed without any requirement that they follow a specified chain of command in reporting the harassment or discrimination. (JA 0320.)

The employee handbook sets forth the Complaint Resolution Procedure available to employees experiencing any work related issues such as harassment. (JA 0320.) OTB maintains an "Open Door Policy" that "encourages an open and frank atmosphere in which any problem, complaint, suggestion, or question receives a timely response." (JA 0316.) Team Members can also file a complaint anonymously by calling the Team Member hotline or utilizing the website at www.MySafeWorkplace.com. (JA 0314.) In addition to the policies outlined in the Employee Handbook, the subject OTB restaurant had a poster on the door of the managers' office which provided information about reporting complaints. (JA 0228-29; JA 0345.)

<u>The March 23, 2015 Incident</u>

On March 23, 2015, plaintiff was working the opening shift from 11:00 a.m. until 4:00 p.m. (JA 0056.) Shortly after 11:00 a.m., Walker arrived at the restaurant with a co-worker, Sherwood Sanders, to submit a physician's note authorizing him to return to work effective March 30, 2015. (JA 0727-28; JA 061; JA 0494.)

Plaintiff was walking with two soda cups in her hands when she first saw Walker. (JA 0063.) Walker approached plaintiff and leaned very close to her face. (JA 0064-65.) Plaintiff stopped walking and was holding the soda cups in her hands directly in front of her body at chest level. (JA 0070.) Walker leaned into her, reached over the cups and used both of his hands to grab and hold onto her breasts. (JA 0066; JA 0070.) Plaintiff alleges that while Walker groped her breasts he said "my God, I miss these . . . ." (JA 0066.) Plaintiff claims that Walker held onto her breasts for ten seconds. (JA 0067-68.) Walker did not touch her anywhere other than her breasts. (JA 0066-67.)

Plaintiff testified that she left the kitchen and served the sodas she was carrying to her customers. (JA 0073.) After she served the sodas, plaintiff approached a co-worker, Caitlin Premich and said "you won't believe what Willie [Walker] just did to me" and she described how Walker allegedly touched her. (JA 0077.) During this conversation, another co-worker, Toni Trunzo, approached and asked what they were talking about. (JA 0077-78.) Plaintiff described the incident to Ms. Trunzo. (JA 0078-79.)

Approximately an hour after the incident occurred, plaintiff went to report it to a manager. (JA 0449-450.) She walked into the kitchen and saw her co-worker Sherwood Sanders, who accompanied Mr. Walker to OTB that morning. (JA 0082.) Plaintiff asked Sanders if he saw what Walker did to her, but he replied that he did not see anything. Plaintiff then described the incident to Sanders. (JA 0087-88.)

Plaintiff proceeded to the managers' office. (JA 0088.) Plaintiff saw the two managers, Nick Clowers and R.J. Cabrera standing near an exit and described the incident. (JA 0089-90.) Clowers took plaintiff to the managers' office and she described the incident again. (JA 0091.) Clowers recommended that they contact Human Resources, but plaintiff said that she wanted to wait before contacting Human Resources. (JA 0092.) Plaintiff testified that she was "still in shock" and that she wanted to make sure her tables were in order. (JA 0092.)

About thirty minutes after their first conversation, Clowers approached plaintiff again, asked if she was okay, and asked who witnessed the incident. (JA 0094.) Plaintiff identified Sanders and Premich as having witnessed the incident. (JA 0340; JA 0447-48.) Clowers prepared a written statement that the plaintiff reviewed and signed. (JA 0055.)

Clowers followed-up with plaintiff several times throughout the day, trying to calm her down and assuring plaintiff that her tables would be taken care of while they handled this. (JA 0095.) Plaintiff testified that Clowers was caring and concerned, and that he did everything she asked him to do. (JA 0095.)

<u>The Investigation</u>

Approximately three or four hours after the incident, at the urging of Clowers, plaintiff contacted Human Resources. (JA 0450.) Plaintiff spoke with Debra Blackmon, Senior Regional Resources Manager for OTB who is responsible for the eastern region. (JA 0099; JA 0351-52.) Clowers was present for the conversation. (JA 0102-03.) Ms. Blackmon asked plaintiff to describe the incident, and asked what plaintiff would like to have as a resolution. (JA 0103.) Blackmon also asked if there were any witnesses. (JA 0495; JA 104-05.) Plaintiff identified Sanders and stated that other team members were also present. (JA 0495; JA 104-05.)

Ms. Blackmon thanked plaintiff for reporting her concerns and asked plaintiff to refrain from speaking with anyone about the incident. (JA 0495; JA 0105.) Ms. Blackmon advised plaintiff that she would conduct an investigation into the allegations of harassment against Mr. Walker, and that she would stay in contact with plaintiff. (JA 0106.) Plaintiff believed that Ms. Blackmon was concerned about her allegations, and plaintiff testified that the conversation was professional. (JA 0106.) Ms. Blackmon noted that plaintiff was defensive and angry when questioned about the incident. (JA 0494-95.)

On March 24, 2015, the day after the incident, Ms. Blackmon received an email from Clowers that plaintiff attempted to reach her. Ms. Blackmon called plaintiff and said

she "wanted to be certain she understood exactly what happened," and asked plaintiff to describe the incident again. (JA 0495; JA 0112-13.) Ms. Blackmon also asked if there were any other witnesses to the incident. (JA 0495; JA 0112-13.) Plaintiff identified Ms. Trunzo. (JA 0495.) Blackmon asked if plaintiff had any previous concerns about, or incidents with, Mr. Walker. (JA 0495; JA 0114-15.) Plaintiff responded that Walker was "very moody on [the] grill" but she had no prior problems with him. (JA 0495, JA 0447; JA 0115-16.) Ms. Blackmon advised plaintiff that she would speak with Mr. Walker as part of her investigation, but that due to his leave of absence she would need to wait until he was released to return to work. (JA 0495; JA 0116.) Plaintiff stated, "I want to feel safe and it makes me angry and mad." (JA 0495.) Ms. Blackmon replied that Mr. Walker would not be permitted to return to work while the investigation was pending. (JA 0495; JA 0116-17.) Ms. Blackmon reiterated OTB's open door policy and assured plaintiff she had done the right thing in reporting the incident. (JA 0495; JA 0116-117.)

Ms. Blackmon next spoke to plaintiff on March 27, 2015. (JA 0496.) Plaintiff expressed frustration with the investigation and Ms. Blackmon explained that they would be unable to reach a resolution until they had an opportunity to speak with Mr. Walker. (JA 0496.) Ms. Blackmon discussed the benefits of the Employee Assistance Program ("EAP") and encouraged plaintiff to take advantage of their services. (JA 0496; JA 0118.)

On April 1, 2015, Ms. Blackmon received notification from the Area Director, Ed Jarvis, that plaintiff resigned. (JA 0496.) Ms. Blackmon called plaintiff to see how she was doing. Plaintiff stated, "I don't feel comfortable here." (JA 0496.) Ms. Blackmon

reminded plaintiff that she had access to the EAP services, which she had yet to utilize. (JA 0496.) Ms. Blackmon also asked what else she could to do help her and plaintiff replied, "You guys have done everything you can do . . . you offered something I have not taken advantage of (EAP)." (JA 0497.)

During this call, plaintiff also expressed concerns that she would be treated differently. (JA 0497.) Ms. Blackmon assured plaintiff that she was correct in reporting the incident, and reminded her that the investigation was confidential. (JA 0497.) Ms. Blackmon stated that they were working towards a resolution, but advised that it takes time to speak with all those involved and to obtain all the pertinent information. (JA 0497.) Plaintiff asked Ms. Blackmon when she anticipated the investigation would be over, and Ms. Blackmon said she hoped to have a resolution by the end of the week. (JA 0497.) Plaintiff decided not to resign at that time. (JA 0497.) Ms. Blackmon told plaintiff to reach out at any time, and said she would call her on Friday with either an outcome or an update. (JA 0497.)

As part of Blackmon's investigation, she conducted phone interviews and obtained statements from all potential witnesses. (JA 0498-500; JA 0393-96; JA 0406.) Ms. Blackmon requested a written statement from Ms. Premich and interviewed her over the phone on April 3, 2015. (JA 0393-94; JA 0499.) During this interview, Ms. Premich said that she did not witness the incident, and knew only what plaintiff told her about the incident. (JA 0499; JA 0699.) Also on April 3, 2015, Ms. Blackmon interviewed Mr. Sanders. He explained that he accompanied Mr. Walker to OTB on the date of the incident so that Mr. Walker could submit a doctor's note to management. (JA 0497.) Mr.

Sanders did not see Mr. Walker touch plaintiff. (JA 0497-98.) Ms. Blackmon also obtained statements from Ms. Trunzo, Mary Sook and Teresa Larson. (JA 0500; JA 0700-03.) These individuals did not witness the incident.

On April 3, 2015, Ms. Blackmon contacted plaintiff to update her on the progress of the investigation. (JA 0498; JA 0133.) Ms. Blackmon informed plaintiff that none of the individuals identified by plaintiff witnessed the alleged incident. (JA 0498; JA 0134.) Plaintiff then suggested that Lisandra Saez may have witnessed the incident. (JA 0498; JA 0134.) That same day, Ms. Blackmon interviewed Ms. Saez on the phone. (JA 0500.) Ms. Saez informed Ms. Blackmon that she did not witness the incident, and that her knowledge was based only on what plaintiff told her.

Ms. Blackmon then interviewed Mr. Walker on April 3, 2015. (JA 0499.) Defendant stated that he exchanged hugs with many Team Members, including plaintiff, who were welcoming him back from his leave of absence. (JA 0499; JA 0735; JA 0779-80.) Mr. Walker denied touching plaintiff's breasts. (JA 0499; JA 0776-77.)

On April 3, 2015, Ms. Blackmon concluded the investigation. (JA 0438; JA 0501.) She determined that there were no witnesses to the alleged incident, there were no prior complaints about Walker from plaintiff or anyone else, and that plaintiff's allegations could not be corroborated. (JA 501; JA 0391-92; JA 0446.) Ms. Blackmon recommended that Walker be returned to work. (JA 501; JA 0391-92.)

Pursuant to OTB's policies and procedures, Ms. Blackmon submitted her recommendation to her immediate supervisor, Jacque Shensky. (JA 0387.) Ms. Shensky

agreed with the recommendation. (JA 0403.) The investigation was concluded and on April 3, 2015 the decision was made to return Walker to work. (JA 0414.)

The final step in the investigation required Ms. Blackmon to speak with plaintiff to discuss the results of the investigation. (JA 0439.) On April 3, 2015, Ms. Blackmon left a voicemail for plaintiff stating that they reached a conclusion in the investigation, and asking plaintiff to contact her any time over the weekend. (JA 0501; JA 0438-41; JA 0136-37.) Plaintiff did not return Ms. Blackmon's call. (JA 0439-40.) In light of the fact that Ms. Blackmon was unable to reach plaintiff, she asked the Area Director to advise Mr. Walker that the investigation was ongoing and that he could not return to work until it was concluded. (JA 0440-41.)

Ms. Blackmon spoke with plaintiff on April 6, 2015. (JA 0442.) She informed plaintiff that the investigation was concluded and OTB was unable to substantiate her claim against Walker. (JA 0442; JA 0137-38; JA 501.) Ms. Blackmon stated that Mr. Walker would be returning to work and then plaintiff hung up the phone. (JA 0442.) Ms. Blackmon testified that, had plaintiff not ended the call she would have advised plaintiff how OTB intended to ensure that she would have only limited contact with Mr. Walker, and that any such contact would be monitored so that she felt comfortable. (JA 0444.)

<u>Remedial Measures</u>

On April 6, 2015, Ms. Blackmon called Walker to advise him of the results of the investigation. (JA 0501.) Ms. Blackmon informed Walker that he could return to work, but that all future contact and communication between him and Plaintiff were limited to business-related subjects. (JA 0501.)

Ms. Blackmon contacted Mr. Jarvis and directed all Allentown managers to monitor the interactions between plaintiff and Mr. Walker. (JA 0444; JA 0501; JA 0536.) Under their existing schedules, Walker and Plaintiff only worked together twice a week for approximately three to four hours per shift. (JA 0443; JA 0707.) Based on their job duties and responsibilities, plaintiff and Walker were only required to interact when plaintiff picked up fajitas. (JA 0240-41; JA 0538.) General Manager Jim Martin[2] approved plaintiff's request to have another server pick up fajitas near where Walker worked. (JA 0707; JA 0241; JA 0538.) This eliminated all work-related interactions between Walker and plaintiff. [3] (JA 0203.)

Pursuant to Ms. Blackmon's recommendation, General Manager Martin directed the managers to keep a "close watch" on plaintiff's interactions with Walker to ensure plaintiff was comfortable with Walker's presence. (JA 0502.) In addition, when Walker returned to work on April 7, 2015, Mr. Martin reviewed OTB's anti-discrimination and

---

[2] General Manager Jim Martin prepared an affidavit on June 13, 2017. (JA 0706-708.) Plaintiff argues that Martin's affidavit should be disregarded under the sham affidavit doctrine. Under this doctrine, "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Baer v. Chase, 392 F.3d 609, 624 (3d Cir. 2004) (citing Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991)). The doctrine is inapplicable where the affiant was never deposed because then the affidavit does not contradict any prior testimony. Ciocca v. B.J.'s Wholesale Club, Inc., No. 04-5605, 2011 WL 5553646, at *7 (E.D.Pa. Nov. 14, 2011). Plaintiff concedes that Martin was not deposed, but nonetheless urges that the doctrine applies because "the record calls into question several statements in Martin's declaration." I disagree. The sham affidavit doctrine is inapplicable because Martin was never deposed. If the affidavit raises a genuine issue of material fact, the proper remedy is to deny defendant's motion. However, as discussed herein, summary judgment is appropriate.

[3] Plaintiff concedes that she had no interaction with Walker following his return to work. (JA 203.)

anti-harassment policies with Walker. (JA 0706-07; JA 0747-48; JA 0800-01; JA 0502; JA 0538.)

Plaintiff resigned on April 17, 2015. Between April 7, 2015 and April 17, 2015, plaintiff worked three shifts with Walker. (JA 0202.) Plaintiff had no interaction with Walker during these shifts and she testified that he did not do anything inappropriate. (JA 0202-03.)

On May 7, 2015, plaintiff filed a Charge of Discrimination with the EEOC. (JA 0342.)

## II.    Procedural History

Plaintiff filed an initial complaint on March 18, 2016. (Doc. No. 1.) Plaintiff's complaint alleged four claims against OTB: (1) hostile work environment based on sexual harassment under Title VII; (2) retaliation under Title VII; (3) negligence under Title VII; and (4) negligent retention under Pennsylvania State law. (Id. at ¶¶ 42-57.) Plaintiff alleged two claims against Walker for assault and battery. (Id. at ¶¶ 58-64.) Plaintiff also sought the imposition of punitive damages. (Id. at ¶¶ 65-69.) On June 20, 2016, defendants filed their Answer with affirmative defenses. (Doc. No. 4.)

On June 16, 2017, following the close of discovery, defendant filed the instant motion to dismiss. (Doc. No. 34.) On June 28, 2017, plaintiff filed a motion for leave to file excess pages (Doc. No. 36) and on June 30, 2017, plaintiff filed a response in opposition to defendant's motion. (Doc. No. 37.)

## III.    Standard

A court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. FED. R. CIV. P. 56(c)(1)(A). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the

other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV. Discussion

### A. Plaintiff fails as a matter of law to establish a hostile work environment under Title VII stemming from sexual harassment.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C § 2000e-2(a)(1). Under Third Circuit precedent, "a plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment." Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999).

To establish a hostile work environment, a plaintiff must demonstrate:

(1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

Huston v. Procter & Gamble Paper Prods. Corp., 568 F. 3d 100, 104 (3d Cir. 2009). The

first four elements demonstrate the existence of a hostile work environment. Id. The fifth

element, and the only element at issue in this motion, establishes employer liability. [4] Id.

Employer liability will not automatically attach where, as here, the hostile work

environment is perpetuated by a non-supervisory co-worker. Id. (citing Kunin, 175 F. 3d

at 293). In such an instance, an employer will be liable "only if the employer failed to

provide a reasonable avenue for complaint[5] or, alternatively, if the employer knew or

should have known of the harassment and failed to take prompt and appropriate remedial

action." Id. Defendant argues that there exists no genuine issue of material fact that

---

[4] Defendant does not dispute that plaintiff successfully established the first four elements necessary to survive a motion for summary judgment. Plaintiff alleges that Walker sexually assaulted her by grabbing her breasts for ten seconds and stating "my God, I miss these." The Supreme Court in Meritor Sav. Bank, FSB v. Vinson. 477 U.S. 57, 65 (1986) explained,

> [i]n defining "sexual harassment," the [EEOC] Guidelines first describe the kinds of workplace conduct that may be actionable under Title VII. These include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." 29 CFR § 1604.11(a) (1985). Relevant to the charges at issue in this case, the Guidelines provide that such sexual misconduct constitutes prohibited "sexual harassment," . . . .

What is more, courts have held that "a single incident of contact with an intimate body part is sufficient to establish a hostile work environment claim." Dillon v. Ned Management, Inc., 85 F. Supp. 3d 639, 656 (E.D.N.Y. Feb. 2, 2015); Redd v. New York Div. of Parole, 678 F.3d 166, 177 (2d Cir. 2012). Based on these facts, defendant does not, and cannot, argue that plaintiff failed to demonstrate the first four elements. Rather, the issue on this motion for summary judgment is whether OTB can be held liable for Walker's actions.

[5] Plaintiff does not dispute that OTB provided a reasonable avenue for complaint. (See Doc. No. 37.) The Employee handbook, which is provided to each new hire, expressly prohibits sexual harassment and explains the multiple avenues for filing complaints. (See e.g., JA 0316 (explaining that OTB has an open door policy for any "problem, complaint, suggestion, or question" and encouraging employees to speak to their Manager, General Manager, Area Director, or any member of the Human Resources team.); see also JA 0316 (providing an option for filing an anonymous complaint by calling the Team Member Hotline or utilizing the website, www.MySafeWorkplace.com.).) This information was also posted on the door to the managers' office. (JA 0345.) I find as a matter of law that OTB provided a reasonable avenue for filing a complaint of sexual harassment.

OBT's remedial measures in response to the March 23, 2015 incident were prompt and appropriate. [6] (Doc. No. 34 at 6-9.) I agree.

Where a plaintiff demonstrates that her employer was on notice of the harassment, she must then demonstrate that the employer's remedial action was inadequate to remedy the alleged harassment. Kunin, 175 F. 3d at 293-94; Bouton v. BMW of N. Am., Inc., 29 F. 3d 103, 110 (3d Cir. 1994). "An employer's remedial action will be adequate 'if it is reasonably calculated to prevent further harassment.'" Huston, 568 F.3d at 109 (quoting Knabe, 114 F.3d at 412 n. 8). The Third Circuit has held that,

> [e]ven if a company's investigation into complaints of sexual harassment is lacking, the employer cannot be held liable for the hostile work environment created by an employee under a negligence theory of liability unless the remedial action taken subsequent to the investigation is also lacking . . . the law does not require that investigations into sexual harassment be perfect.

Knabe, 114 F. 3d at 412.

Here, as discussed above, Ms. Blackmon contacted plaintiff the same day plaintiff filed her complaint against Walker. (JA 0450.) She inquired into the incident and whether there were any witnesses. (Id.) Ms. Blackmon spoke with and obtained written statements

---

[6] Defendant also argues that with respect to any alleged prior acts by Walker, plaintiff failed to demonstrate OTB's knowledge. (Doc. No. 34 at 3-6.) I agree. Plaintiff alleged in her EEOC complaint that she was subjected to Walker's sexual harassment for a period of years leading up to the incident on March 23, 2015. Plaintiff knew of OTB's various avenues for reporting complaints, (see e.g., JA 0052-53; JA 0231), and failed to report these alleged prior instances of harassment. Plaintiff was also unable to identify any witnesses to Walker's alleged prior harassment or inappropriate behavior. (JA 0219-22.) Tellingly, plaintiff does not oppose this portion of defendant's motion. In fact, plaintiff told Ms. Blackmon that other than the alleged incident on March 23, 2015, Walker never acted inappropriately towards her. (JA 0446-47; JA 0501.) I find that plaintiff cannot establish that OTB knew or should have known of any prior misconduct by Walker. Therefore, my analysis focuses only on whether OTB "took prompt and adequate remedial action" after receiving notice of the March 23, 2015 incident. Knape v. Boury Corp., 114 F. 3d 407, 412 (3d Cir. 1997).

from each employee identified by plaintiff as having possibly witnessed the incident. (JA 0498-500; JA 0393-96; JA 0406.) None of the individuals witnessed the incident. Ms. Blackmon interviewed Mr. Walker who denied the allegations. (JA 0499.) During this 14-day investigation, Ms. Blackmon spoke with plaintiff six separate times. (JA 0448.) Ms. Blackmon made the following findings: (1) that there were no witnesses to the alleged incident; (2) there were no prior complaints about Walker from plaintiff or anyone else, and (3) plaintiff's allegations could not be corroborated. (JA 0501; JA 0391-92; JA 0446.) Ms. Blackmon's conclusion that Walker was permitted to return to work was based, in part, of the fact that during Walker's fairly lengthy term of employment with OTB, he had no history of this type of behavior and there was no documentation of prior inappropriate conduct.[7] (JA 0429; JA 0464.)

---

[7] Despite Ms. Blackmon's thorough and lengthy investigation discussed herein, Plaintiff argues that the investigation was so flawed as to render its remedial action inadequate. First, plaintiff argues that the investigation was flawed because Ms. Blackmon did not interview any witnesses in person. Ms. Blackmon testified that she was able to assess credibility over the phone based on voice inflection, demeanor, and emotional state. (JA 0402.) The evidence also establishes that she spoke with each person identified by plaintiff, including those not initially mentioned by plaintiff, and obtained written statements. Conducting these interviews over the phone rather than in person does not render the investigation flawed. Equally unconvincing is plaintiff's second argument that the investigation was somehow flawed because Ms. Blackmon did not obtain Walker's statement until he returned from medical leave, eleven days after the incident. Ms. Blackmon testified that it was OTB's policy not to contact employees while on medical leave (JA 0417), and Walker was scheduled to return on March 30, 2015. (JA 0494.) I find that it was reasonable to wait until Walker's return from medical leave to obtain his statement, especially where every other aspect of the investigation was promptly handled. Finally, plaintiff argues that a remedial measure is inadequate if it places the burden on the victim to report future harassment. First, plaintiff relies only on Ninth Circuit case law for this proposition. Even if this were controlling authority, plaintiff's argument ignores the other remedial measures in place: specifically, all contact between plaintiff and Walker was eliminated during their two weekly shifts, and all managers were directed to monitor any interactions. The fact that OTB also reiterated the open door policy to plaintiff does not negate these remedial measures, but instead demonstrates their commitment to ensure plaintiff's safety. I find that no reasonable jury could

Although Ms. Blackmon was unable to make a finding that the harassment occurred, she nevertheless took remedial action to "ensure that . . . [plaintiff] felt comfortable." (JA 0444.) Walker was reissued the Employee Handbook, and specifically the section pertaining to sexual harassment.[8] Ms. Blackmon also limited plaintiff's contact with Walker. Plaintiff and Mr. Walker both had long-established schedules, which overlapped on only two shifts per week for approximately three or four hours per shift. (JA 0443.) During the limited time when their shifts overlapped, General Manager Martin approved plaintiff's request to designate another server to pick up her fajita orders. (JA 0707.) In doing so, OTB eliminated the only business-related interaction plaintiff and Walker would have over the course of a shift. (JA 0240-41; JA 0538; JA 0203.) Ms. Blackmon also directed the managers to monitor any interactions between Walker and plaintiff to ensure her safety. (JA 0444.) I find that these remedial measures were prompt and appropriate to prevent future harassment. See Knabe, 114 F.3d at 413 (holding that the employer's remedial action was adequate where the evidence demonstrated that the employer discussed the company's policies concerning sexual harassment with the alleged harasser, and informed plaintiff of her rights in the case of future improper conduct.)

---

conclude that Ms. Blackmon's investigation was so flawed as to render the remedial action inadequate.

[8] Plaintiff argues that there is a question of fact whether the handbook was actually reviewed with Walker. (JA 0755.) It is undisputed that prior to Walker's return to work, he was reissued the Employee Handbook. (JA 0709-10.) It is also undisputed that those portions of the handbook addressing sexual harassment were highlighted for Mr. Walker. (Id.) Mr. Walker signed and dated the Employee Handbook immediately below the highlighted portions that addressed sexual harassment. (Id.) I am satisfied that there is no genuine issue of material fact that Walker was reissued the employee handbook and that the relevant portions were brought to Mr. Walker's attention.

In her opposition, plaintiff sets forth alternative remedial measures that should have been taken by OTB. For instance, plaintiff argues that OTB should have modified their work schedules so that they did not have to work together.[9] Plaintiff also submits that Walker should have been fired or, at the very least, OTB should have granted her request to have a manager shadow her during her shifts. However, plaintiff's preference for another remedial measure does not render OTB's response inadequate. As explained by the court in Knabe,

> [I]f the remedy chosen by the employer is adequate, an aggrieved employee cannot object to that selected action. Concomitantly, an employee cannot dictate that the employer select a certain remedial action. We agree with the Seventh Circuit that: "No doubt, from [the plaintiff's] perspective, [the defendant] could have done more to remedy the adverse effects of [the employee's] conduct. But Title VII requires only that the employer take steps reasonably likely to stop the harassment."

114 F.3d at 414 (quoting Saxton v. AT&T Co., 10 F.3d 526, (7th Cir. 1993).

Here, the remedial measures taken by OTB were reasonably calculated, and did in fact prevent future harassment by Walker. Plaintiff testified that after making her complaint, Walker never acted inappropriately towards her. (JA 0202.) Plaintiff had no interaction with Walker during any of the three shifts that she worked with him following

---

[9] Plaintiff submits that Ms. Blackmon had the ability to modify their work schedules but declined to do so. Plaintiff also points to contradictory testimony concerning whether efforts were made to modify their work schedules. (See e.g., JA 0749 (Walker testified that when he was told to return to work, he was told to return to his normal shift); but see, JA 0707 (Manager Martin's affidavit stating that he "discussed with Walker his ability to change his work schedule; however, [Walker] was unable to change his schedule due to another job he had at the time.").) For the reasons discussed herein, this does not create a genuine issue of material fact. OTB's remedial measures were adequate and prevented future harassment regardless of whether OTB attempted to modify their work schedules. See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 717 (rejecting the per se rule that requiring an employee to work in close proximity with her alleged harasser creates a hostile work environment).

his return to work. (JA. 0203). I find as a matter of law that OTB took prompt and adequate remedial measures to prevent future harassment. Andreoli v. Gates, 482 F.3d 641, n. 3 (3d Cir. 2007) (citing Knabe, 114 F.3d 407 n. 8) ("A remedial action that stops the harassment is adequate as a matter of law."); Bouton, 29 F.3d at 110 ("we hold that an effective grievance procedure—one that is known to the victim and that timely stops the harassment—shields the employer from Title VII liability for a hostile work environment."). Therefore, Plaintiff's claim alleging a hostile work environment in violation of Title VII is dismissed.

## B. Plaintiff cannot establish a prima facie case of retaliation.

Title VII prohibits an employer from "discriminat[ing] against any individual . . . because [she] has opposed any practice made an unlawful employment practice . . . or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing . . . ." 42 U.S.C. § 2000e-3(a). A plaintiff alleging a claim for retaliation must demonstrate that: "'(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir.1995)).

It is undisputed that plaintiff engaged in a protected activity when she reported the alleged sexual harassment. Defendant argues that plaintiff is unable to demonstrate that she was subjected to an adverse employment action. (Doc. No. 34 at 9-13.) I agree. For

the reasons discussed in detail below, I find that plaintiff voluntarily resigned from OTB, and she is unable to demonstrate that she was constructively discharged.

To demonstrate an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Burlington N. Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.2d 1211, 1219 (D.C. Cir. 2006)). It is well-settled that "an employee's voluntary resignation does not constitute an adverse employment action" unless the employee can demonstrate she was constructively discharged. Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 705 (E.D.Pa. 2016); Checa v. Drexel Univ., No. 16-108, 2016 WL 3548517, at *5 (E.D.Pa. 2016) ("Our Court of Appeals has not recognized voluntary resignations to be adverse employment actions.").

Constructive discharge requires a finding that "the employer knowingly permitted a condition of discrimination in employment so intolerable that a reasonable person subject to them would resign." Angeloni v. Diocese of Scranton, 135 F. App'x 510, 513 (3d Cir. 2005) (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (1984)). However, "employees are not guaranteed stress-free environments and . . . discrimination laws cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting." Conners v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998) (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992)) (internal quotations omitted). The Third Circuit explained,

> Intolerability is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest choice or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his best interest to resign. Rather, [i]ntolerability is addressed by the objective standard of whether a reasonable person in the employee's position would have felt <u>compelled</u> to resign,-that is, whether he would have had no choice but to resign.

<u>Conners</u>, 160 F.3d at 976 (3d Cir. 1998) (citing <u>Blistein v. St. John's College</u>, 74 F.3d 1459 (4th Cir. 1996)) (internal quotations omitted) (alteration and emphasis in original).

Courts consider the following factors in assessing whether an employee was constructively discharged:

> whether the employer (1) threated [the employee] with discharge or urge[d] or suggest[ed] that she resign or retire, (2) demote[d] her, (3) reduce[d] her pay or benefits, (4) involuntarily transferred [her] to a less desirable position, (5) altered her job responsibilities, or (6) gave unsatisfactory job evaluations.

<u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495, 502 (3d Cir. 2010) (citing <u>Clowes v. Allegheny Valley Hosp.</u>, 991 F.2d 1159, 1161 (3d Cir. 1993)) (internal quotations omitted) (alterations in original).

Here, plaintiff voluntarily resigned on April 17, 2015. (JA 0160.) Plaintiff fails to demonstrate that OTB permitted such intolerable working conditions that a reasonable person in plaintiff's position would have felt compelled to resign. None of the factors discussed in <u>Colwell</u>, <u>supra</u>, are present here.[10] Instead, plaintiff presents hypothetical scenarios to demonstrate that she was constructively discharged. For instance, plaintiff

---

[10] Although the "absence of the factors in <u>Clowes</u> is not necessarily dispositive" I nonetheless find that these facts simply do not reach the level of "intolerable conditions" necessary for a finding that plaintiff was constructively discharged. <u>Duffy v. Paper Magic Group, Inc.</u>, 265 F.3d 163 (3d Cir. 2001).

argues that OTB effectively reduced her pay when Ms. Blackmon told her that she was "expected to work with [Walker] or lose [her] time." (JA 0140.) Plaintiff also states that General Manager Martin told her to find a way to "move on and focus on the 99.9% of the other people here and [her] guests as they don't want a server coming to the table that is or has been crying." (JA 01062.) According to plaintiff, this "clearly indicates" that she would receive an unsatisfactory job evaluation. I disagree.

It is well-settled that "[t]he law of constructive discharge is not concerned with subjective fears of possible future dismissal." Tunis v. City of Newark, 184 Fed. Appx. 140, 143 (3d Cir. 2006). As the Third Circuit explained,

> While the law protects employees from concerted, calculated efforts to expel them or the imposition of unduly harsh conditions not visited upon their co-worker in order to force them to quit, it does not guarantee that they will not suffer frustrations, challenges, disappointments and discipline.

Id. Plaintiff's generalized statements of possible future discipline and reduced pay do not amount to a constructive discharge. There is no evidence that plaintiff was threatened with dismissal or that she was subject to disciplinary charges or a poor work evaluation. In fact, plaintiff testified that other than not firing Walker, there was nothing OTB management did that led to her resignation. (JA 0163.) See Duffy, 265 F.3d at 169 (dismissing plaintiff's claim alleging constructive discharge noting that although plaintiff alleged that management deliberately delayed providing needed assistance, this merely made her job "more stressful, but not unbearable," and reasoning that plaintiff's "tasks

remained the same . . . [s]he was never assigned degrading or menial tasks and she consistently received pay increases during her employment.").[11]

What is more, in arguing that she was constructively discharged, plaintiff ignores the effective remedial measures put in place by OTB that prevented any future harassment, and eliminated all contact between plaintiff and Walker. This simply does not amount to a claim for constructive discharge. Cf. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084-85 (3d Cir. 1996) (employer was not entitled to summary judgment on a claim of constructive discharge where plaintiff was subjected to a "continuous pattern of discriminatory treatment over a period of years.")

I find that no reasonable jury could conclude that plaintiff's working conditions were so intolerable that she had no choice but to resign form OTB. Plaintiff's claim alleging retaliation under Title VII is dismissed.

---

[11] The Plaintiff in Duffy pointed to additional evidence that she was constructively discharged and yet the court concluded that she failed to reach the threshold of "intolerable conditions." 265 F. 3d at 169. For instance, plaintiff alleged she was excluded from committees, hiring decisions, a staff meeting, and a supervisor seminar. Id. The Court held that "although [plaintiff] may have subjectively believed that these circumstances were too onerous to bear, no reasonable trier of fact could conclude that exclusion from committee membership or lack of hiring authority renders working conditions objectively intolerable." Id. Duffy also argued that she was the only supervisor who was given a weekly report card measuring her job performance. The court rejected this argument because plaintiff failed to demonstrate that it "placed greater requirements on her than others or imposed unreasonably exacting standards of her job performance." Id. Plaintiff alleged that her supervisors made disparaging remarks based on her age. Id. at 170. The Court noted that these comments, although inappropriate, "were not sufficiently derogatory or offensive to compel a reasonable person to resign." Id. Finally, plaintiff alleged that her employer failed to give her a promotion, but the court concluded that plaintiff failed to demonstrate that she was qualified for the position. Id. Here, plaintiff sets forth significantly less evidence than the plaintiff in Duffy. In fact, as discussed above, plaintiff points to no actual evidence that the work conditions were intolerable. Plaintiff's theoretical allegations do not come near the threshold of "intolerable conditions."

**C. OTB was not negligent in retaining Walker.**

Defendant argues that plaintiff's claim alleging negligent retention of Walker should be dismissed because OTB had no reason to know that Walker had a propensity for sexual harassment prior to the incident on March 23, 2015 and that, following the incident, OTB took appropriate measures to prevent future harassment. (Doc. No. 34 at 13-15.) Plaintiff submits no opposition to this point. For the reasons discussed below, I find that plaintiff's negligent retention claim fails as a matter of law.

A plaintiff alleging negligent retention under Pennsylvania law,[12] must demonstrate that her loss resulted from,

> (1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee.

Belmont v. MB Inc. Partners, Inc., 708 F.3d 470, 447-48 (3d Cir. 2013) (citing Dempsey v. Walso Bureau, Inc., 431 Pa. 562 (1968)). The primary issue in a negligent retention claim "is not whether the employer's actions were reasonable in light of the circumstances . . . [i]nstead, the court must determine whether 'the employer knew, or in the exercise of ordinary care, should have known of the necessity for exercising control over his employee.'" Schofield, 894 F. Supp. at 196 (quoting Dempsey, Inc., 431 Pa. at 596).

---

[12] The Supreme Court of Pennsylvania adopted the Restatement (Second) of Torts § 317 (1965) to evaluate negligent retention claims. Schofield v. Trustees of University of Pennsylvania, 894 F. Supp. 195, 196 (E.D.Pa. 1995).

Here, it is undisputed that OTB had a policy prohibiting sexual harassment and provided various avenues for reporting complaints. (JA 0306; JA 0048-49; JA 0228-29; JA 0345; JA 0319-21; JA 0316.) It is also undisputed that plaintiff did not report any prior misconduct by Walker prior to March 23, 2015. (JA 0171; JA 0214.) Plaintiff testified that no one witnessed any prior harassment by Walker (JA 0219-22), and she never experienced any inappropriate behavior from Walker before March 23, 2015. (JA 0446-47; JA 0501.) Based on these facts, I find that OTB did not know, and had no reason to know that it was necessary to exercise control over Walker prior to the subject incident. Therefore, liability cannot attach for any conduct alleged prior to March 23, 2015.

Upon receipt of plaintiff's complaint concerning the March 23, 2015 incident, and as discussed in detail in section (I), OTB conducted a thorough investigation into plaintiff's allegations. Despite concluding that they were unable to substantiate plaintiff's claims, OTB took appropriate remedial measures that successfully prevented any future inappropriate behavior or harassment. (JA 0202-03.) OTB cannot be held liable for failing to prevent an intentional harm when they did, in fact, prevent any future harassment. Therefore, I find that plaintiff's claim alleging negligent supervision is dismissed.

**V.     Conclusion**

I find that there is no genuine dispute as to any material fact concerning plaintiff's Claims against OTB. Summary judgment is granted as to OTB and Counts One through Four of plaintiff's complaint are dismissed with prejudice.

An appropriate order follows.